1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10
11

NULIFE VENTURES, INC.,

Case No. 20-cv-2019-BAS-KSC

12

Plaintiff,

**ORDER ON PLAINTIFF'S MOTION**

13

v.

**FOR PRELIMINARY INJUNCTION**
**(ECF No. 6)**

14

AVACEN, INC., et al.,

15

Defendants.

16
17

Plaintiff NuLife Ventures, Inc. is a multi-level marketing ("MLM") company that

18

sells health products through a network of sales agents known as Independent Brand

19

Partners ("IBPs"). In 2019, Defendant AVACEN, Inc. entered into a contract with NuLife

20

to supply certain medical devices developed by AVACEN's founder, Defendant Thomas

21

G. Muehlbauer. AVACEN registered as NuLife's IBP and transferred AVACEN's

22

existing sales agents to NuLife. In 2020, NuLife and AVACEN's relationship faltered.

23

NuLife sued AVACEN in Tennessee and sought to enjoin AVACEN from launching a

24

competing MLM or recruiting NuLife's IBPs. The Tennessee trial court denied

25

preliminary injunction. NuLife appealed the judgment, which is now pending in

26

Tennessee.

27

AVACEN launched an MLM business that would sell its medical devices and began

28

recruiting its own sales agents. NuLife alleges that its IBPs received emails and text

- 1 -

messages from AVACEN, soliciting the IBPs' participation in online presentations designed to recruit the IBPs. NuLife filed the present action and seeks to enjoin AVACEN from recruiting its IBPs. The Court must decide whether NuLife has established the grounds for preliminary injunctive relief. The Court held a hearing on the motion for preliminary injunction on December 2, 2020. The motion is now ripe for decision. Because the balance of hardships, likelihood of success on the merits of the claims, and public interest weigh against preliminary injunction, the Court denies relief.

## I.    BACKGROUND

Defendant AVACEN is a Wyoming Corporation that has been in operation for thirteen years. (Decl. of Thomas G. Muehlbauer ("Muehlbauer Decl.") ¶ 3, ECF No. 16-1.) Its founder, Thomas Muehlbauer, invented certain medical devices known as the AVACEN 100 and the AVACEN Pro (collectively, the "Medical Devices"). (Muehlbauer Decl. ¶ 3.) Defendant Danielle Forsgren is Muehlbauer's wife and an executive of AVACEN. (Decl. of Robert Doran ("Doran Decl.") ¶ 4, ECF No. 6-11.)

Plaintiff NuLife is a Nevada Corporation, whose executives include Executive Vice-President, Robert Doran and Chief Compliance Officer, Sherri Adams. (Doran Decl. ¶ 1; Decl. of Sherri Adams ("Adams Decl. [1]") ¶ 1, ECF No. 6-12.) NuLife markets healthcare products, including AVACEN's Medical Devices, through a network of sales agents known as the IBPs. (*Id.* ¶ 2.) Like other MLM businesses, NuLife incentivizes its IBPs to recruit and sponsor others to join NuLife as an IBP. (Adams Decl. [1] ¶ 2.)

### A. Contracts at issue

#### 1.    Reseller Agreement

NuLife and AVACEN entered into a contract entitled the Distributor / Reseller Agreement (the "Reseller Agreement") in January 2019. (Muehlbauer Decl. ¶ 5.) The Reseller Agreement "describes the terms and conditions governing [NuLife's] right to resell certain Products and Services of AVACEN." (*Id.*; Reseller Agreement, ECF No. 16-2 at 2.)

The Reseller Agreement was to remain in effect for an initial term of three years, to be automatically renewed for successive three-year terms in the absence of a timely notice of intent not to renew.  (Reseller Agreement § 12.)  A party could terminate the Reseller Agreement for cause "if the other Party commits a material breach," which included a failure to meet the purchase quota of "60% or less of Territory Forecast Product sales, that remains uncured after the expiration of forty-five (45) days' written notice specifying the basis for the breach."  (*Id.* § 12.c.)  The Reseller Agreement sets forth the purchase quota as follows:

**Exhibit A**
**Program Description**
**Description of AVACEN Medical Services**

. . .
**5.  FORECAST**
. . .
5.2.    Vendor and Nulife Ventures have agreed on a 2019 **Territory Forecast** for the relevant products as set forth in Schedule E.

. . .

**Exhibit E**
**Territory and 2019 Sales Forecast**

**North America**

Months 1–6: 1500 Products or 1.5 Million dollars in total Avacen purchases and or services

Months 7–12: 4500 Products or 4.5 Million dollars in total Avacen purchases and or services

(Reseller Agreement § 14.i, Ex.s A & E, ECF No. 16-2.)

The Reseller Agreement also provides that "[n]o failure or delay by either Party in exercising any right under this Agreement shall operate as a waiver of such right."  (*Id.* § 14.i.)

As consideration for entering into the Reseller Agreement, NuLife gave AVACEN access to its "Back-Office" online platform for free.  (Muehlbauer Decl. ¶¶ 7–9.)  Using

the Back-Office, AVACEN transferred more than 200 of its existing sales agents to NuLife and earned the position as a "NuLife Director." (*Id.* ¶ 10.) The position entitled AVACEN to receive an annual compensation of $34,500 from NuLife. (*Id.*)

**2. IBP Agreement**

Anyone who applies to become an IBP for NuLife is required to sign and submit a document entitled "INDEPENDENT BRAND PARTNER APPLICATION & AGREEMENT" (the "IBP Agreement"), by which the applicant agrees to certain terms and conditions, including the provisions of NuLife's Policies and Procedures. (IBP Agreement § 1, ECF No. 6-2.) AVACEN, by and through Forsgren, submitted its application to become an IBP on March 5, 2019. (Adams Decl. [1] ¶ 5.) On May 26, 2020, AVACEN, by and through Forsgren, renewed its acceptance of the terms of the IBP Agreement by clicking through a digital acceptance form. (*Id.* ¶ 6.) According to AVACEN, NuLife unilaterally blocked its access to the Back-Office and required AVACEN to accept the updated NuLife Policies and Procedures in order for AVACEN to regain access. (Muehlbauer Decl. ¶¶ 11–12.)

The IBP Agreement is an at-will contract. It allows the IBP to "cancel this Agreement at any time, and for any reason, upon written notice to Company at its principal business address." (IBP Agreement, § 2.)

Section 8 of the IBP Agreement contains a non-compete clause:

> **8. Non-Solicitation Agreement.** In accordance with the Policies and Procedures, you agree that during the period while you are an Independent Brand Partner, and for one (1) calendar year following resignation, non-renewal, or termination of your business, you will not encourage, solicit, or otherwise attempt to recruit or persuade any other Independent Brand Partner to compete with the business of NuLife Ventures.

(IBP Agreement, § 8.)

NuLife Policies and Procedures, incorporated into the IBP Agreement, also contains a non-compete clause:

//

### 3.13 Solicitation for Other Companies or Products

A. An IBP may participate in other direct sales, multilevel, network marketing or relationship marketing business ventures or marketing opportunities, that are noncompeting products with NuLife Ventures. However, during the term of this Agreement and for one (1) year thereafter, an IBP may not recruit any NuLife Ventures Customers or IBPs for any other direct sales or network marketing business unless Customer(s) or IBP(s) were personally sponsored by such IBP. Any product or service in the same category as NuLife Ventures products or services is deemed to be competing (i.e., any competing product or service regardless of differences in cost or quality).

B. The term "recruit" means actual or attempted solicitation, enrollment, encouragement, or effort to influence in any other way (either directly or through a third party), another Customer/IBP to enroll or participate in any direct sales or network marketing opportunity. This conduct represents recruiting even if the IBP's actions are in response to an inquiry made by another Customer/IBP. However, an IBP may sell non-competing products or services to NuLife Ventures Customers and IBPs that they personally sponsored.

C. An IBP may not display or bundle NuLife Ventures products or services, in sales literature, on a website or in sales meetings, with any other products or services to avoid confusing or misleading a prospective Customer or IBP into believing there is a relationship between NuLife Ventures and non-NuLife Ventures products and services.

D. An IBP may not offer any non-NuLife Ventures sales opportunity, products or services at any Company related meeting, seminar or convention, or immediately following a Company event.

E. A violation of any of the provisions in this section shall constitute unreasonable and unwarranted contractual interference between you and NuLife Ventures and would inflict irreparable harm on the Company. In such event, the Company may, at its sole discretion, impose any sanction it deems necessary and appropriate against such IBP or IBP's business, including termination, or seek immediate injunctive relief without the necessity of posting a bond.

(NuLife Policies and Procedures, § 3.13, ECF No. 6-3.)

The Policies and Procedures also include certain provisions governing confidential information:

**8.1 Business Reports, Lists, Patents and Proprietary Information**

A. By completing and signing the Independent Brand Partner Agreement, you acknowledge that Business Reports, lists of Customer and IBP names and contact information . . . are confidential and proprietary information and trade secrets belonging NuLife Ventures, LLC.

. . .

**8.2  Obligation of Confidentiality**

B. During the Term of the Independent Brand Partner Agreement and for a period of five (5) years after the termination or expiration of the Agreement between you and NuLife Ventures, you shall not:

I.    Use the information in the Reports to compete with NuLife Ventures or for any purpose other than promoting your business;

II.   Use or disclose to any person or entity any confidential information contained in the Reports, including the replication of the genealogy in another network marketing company.

(NuLife Ventures Policies and Procedures §§ 8.1, 8.2.)

The Policies and Procedures also contain the terms governing corporate oversight over IBPs' online presence and e-commerce activities.  (NuLife Policies and Procedures § 9.4.)

**B.     Events in June 2020**

Muehlbauer's declaration states that NuLife fulfilled just half of the contractual purchase quota that the Reseller Agreement required.  (Muehlbauer Decl. ¶ 14.)  On June 1, 2020, Muehlbauer notified NuLife that it was in material breach of the Reseller Agreement and gave it 45 days to cure the breach.  (*Id.*; Notice of Contract Termination, ECF No. 16-2 at 28.)   NuLife replied to the notice, in which NuLife denied that it

- 6 -

1  committed a breach.  (Muehlbauer Decl. ¶ 17; NuLife's Letter dated June 2, 2020, ECF
2  No. 16-2 at 30–32.)  NuLife did not purchase any more Medical Devices from AVACEN.
3  (Muehlbauer Decl. ¶¶ 16, 18.)

4      On June 23, 2020, NuLife's counsel notified Muehlbauer and Forsgren that NuLife
5  suspended AVACEN's Back-Office access "stemming from violations of the NuLife
6  Ventures IBP Agreement and Policies and Procedures."  (Thomas Ritter email dated June
7  23, 2020, ECF No. 16-4 at 2; Muehlbauer Decl. ¶ 21.)  AVACEN alleges that it has not
8  earned any commissions from NuLife after that date.  (Muehlbauer Decl. ¶ 22.)  On June
9  30, 2020, AVACEN notified NuLife that AVACEN would consider NuLife's suspension
10 of AVACEN's access to NuLife's Back-Office as a termination of the IBP status unless
11 NuLife provided an explanation.  (*Id.* ¶ 23; Decl. of Chris Wellman ¶ 4, ECF No. 16-3;
12 Chris Wellman email dated June 30, 2020, ECF No. 16-4 at 2.)  AVACEN did not receive
13 a response from NuLife.  (Wellman Decl. ¶ 4.)

14      **C.    Tennessee Action**

15     On June 22, 2020—three weeks after AVACEN notified NuLife about the alleged
16 breach of the Reseller Agreement—NuLife sued AVACEN in the Circuit Court for
17 Hamilton County in Tennessee.  (Verified Compl. for Inj. Relief, ECF No. 16-2 at 34–42.)
18 NuLife sought a temporary restraining order (TRO) banning AVACEN from competing
19 with NuLife "as the exclusive global distributor/reseller of the Medical Devices" and from
20 violating the Reseller Agreement and the IBP Agreement.  (*Id.* at 7–8.)  The circuit court
21 granted the TRO and ordered AVACEN to refrain from (a) recruiting NuLife IBPs to
22 compete with its business; (b) selling the AVACEN Medical Devices; and (c) soliciting or
23 collecting the names and contact information of NuLife's IBPs.  (TRO, ECF No. 23-1.)
24 AVACEN opposed the TRO, arguing in part that it did not intend to start a competing
25 MLM company or use NuLife's proprietary information.  (Def.s' Resp. in Opp. to Pl.'s
26 TRO at 7, ECF No. 22-1.)

27     The circuit court held a hearing and considered witness testimony and documents
28 offered by NuLife.  (Order Dissolving TRO and Denying Req. for Temp. Inj., ECF No. 16-

2 at 45.)  Finding that NuLife had not demonstrated that it would suffer an irreparable injury in the absence of a temporary relief, the court dissolved the TRO and denied NuLife's request for a temporary injunction.  (*Id.*)  NuLife moved for reconsideration of the court's judgment, which the court denied.  (Final Order, ECF No. 24-1.)  The court issued a final order.  (*Id.*)  NuLife filed an appeal, which is ongoing in Tennessee as of December 2, 2020.[1]

### D.  Dismissed Federal Action by AVACEN

In July, AVACEN filed a federal action against NuLife in San Diego, raising breach of contract claims.  (AVACEN's Compl., *Avacen, Inc. v. NuLife Ventures, LLC*, No. 3:20-cv-01459-WQH-WVG (Jul. 29, 2020), ECF No. 1.)  AVACEN alleged that NuLife violated the terms of the Reseller Agreement, lost the right to sell AVACEN Medical Devices, yet continued to sell them.  (AVACEN's Compl., *Avacen, Inc. v. NuLife Ventures, LLC*, No. 3:20-cv-01459-WQH-WVG (Jul. 29, 2020), ECF No. 1.)  AVACEN sought a temporary restraining order enjoining NuLife from selling the Medical Devices, displaying them on NuLife's website, and representing to the public that NuLife had the right to sell the Medical Devices.  (AVACEN's Ex Parte App. for TRO, *Avacen, Inc. v. NuLife Ventures, LLC*, No. 3:20-cv-01459-WQH-WVG (Jul. 29, 2020), ECF No. 2.)

The action was terminated when AVACEN voluntarily dismissed its Complaint.  (Notice of Voluntary Dismissal, *Avacen, Inc. v. NuLife Ventures, LLC*, No. 3:20-cv-01459-WQH-WVG (Sep. 16, 2020), ECF No. 21.)

### E.  AVACEN's Zoom Meetings

In September, certain NuLife IBPs received emails and text messages, advertising AVACEN's online Zoom presentations about a new MLM sales opportunity at AVACEN.  (Doran Decl. ¶¶ 2–4; Adams Decl. [1] ¶ 7.)  According to NuLife, AVACEN hosted at least three presentations on September 23, 2020, September 26, 2020, and October 1, 2020, and continues to host the presentations.  (Doran Decl. ¶¶ 2–6.)

---

[1] The parties have stated on the record at the December 2, 2020 hearing that the appeal of the Tennessee court's judgment is ongoing.

1    NuLife's executives, who participated in the Zoom meetings, allege that AVACEN
2    advertised a hiring plan that incentivizes the applicants with prior experience of selling a
3    certain number of AVACEN medical devices to join AVACEN.  (Doran Decl. ¶ 7; Adams
4    Decl. [1] ¶ 9.)   They allege that only NuLife IBPs can have the qualifying experience
5    because NuLife had the exclusive rights to sell the AVACEN devices.  (Doran Decl. ¶ 7.)
6    During one presentation, AVACEN allegedly stated that prospective applicants can prove
7    their prior sales record by using the data maintained in NuLife Back-Office platform.
8    (Doran Decl. ¶ 8.)  In addition, AVACEN allegedly used the following slide during its
9    Zoom presentation:

> The AVACEN device is manufactured in San Diego, California.  You, and
> your clients, will purchase these devices directly from AVACEN. **NO**
> **MIDDLEMEN!**

13   (Doran Decl. ¶ 5; Adams Decl. [1] ¶ 9; Ex. 6 to Pl.'s Mot. for Prelim. Inj., ECF No. 6-6.)

14        **F.      Present Federal Action**

15        NuLife brought the present action against AVACEN, Muehlbauer, and Forsgren, on
16   October 13, 2020, raising claims of breach of contract, interference with prospective
17   economic relations, and misappropriation of trade secrets.  (Compl., ECF No. 1.)  As
18   relevant to the present motion for preliminary injunction, NuLife claims that AVACEN
19   has breached the non-compete clauses by encouraging, soliciting, and/or persuading
20   NuLife's IBPs to join AVACEN's own direct sales company.  (Compl. ¶¶ 23–40.)  NuLife
21   raises the related claims that Defendants are inducing other NuLife IBPs to breach their
22   contracts with NuLife by recruiting them to enroll in a competing MLM company.  (Compl.
23   ¶¶ 48–54.)  NuLife also argues that Defendants are intentionally interfering with NuLife's
24   contracts with its IBPs and pertinent prospective economic relations.  (Compl. ¶¶ 55–68.)
25   Finally, NuLife argues that Defendants misappropriated NuLife's trade secrets, including
26   its IBPs' names, contact information, purchase history, and sales data.  (Compl. ¶¶ 69–80.)
27   //
28   //

### 1.   Denial of Temporary Restraining Order

On October 20, 2020, the Court denied NuLife's motion for temporary restraining order (TRO), based in part on the finding that NuLife did not meet its burden to show irreparable harm.  *See Nulife Ventures, Inc. v. Avacen, Inc.*, No. 20-CV-2019-BAS-KSC, 2020 WL 6150440, at *2 (S.D. Cal. Oct. 20, 2020) ("To the extent that NuLife argues that it will permanently lose its sales force and revenue stream because of Defendants' competition in violation of a contract, NuLife does not support its argument with requisite proof.")  In that Order, the Court found that the following declaration by a NuLife executive was not enough to show irreparable harm:

> The products being sold by and through AVACEN's new network marketing venture constitute the primary revenue source for NuLife. AVACEN is thus substantial harm to NuLife each day that it operates this competing company recruits NuLife IBPs to enroll. The ongoing loss of revenue and IBPs has been devastating to our company and threatens the viability of NuLife if not promptly stopped. Moreover, AVACEN's actions have caused significant and uncertainty amongst current and prospective NuLife IBPs. Since AVACEN's launch of its network venture in late September, our management team has fielded dozens of calls and messages from NuLife IBPs concerned for the health of the company and their own financial future.

(Decl. of Sherri Adams ¶ 16, ECF No. 4-12.)

### 2.   Present Motion for Preliminary Injunction

After the Court denied TRO, NuLife filed the same documents and exhibits as its motion for preliminary injunction.  (Mot. Prelim. Injunction, ECF No. 6.)  Two weeks later, NuLife filed a supplemental declaration by Sherri Adams, which states in relevant part:

> 3. NuLife's business is dependent upon the enrollment of Independent Brand Partners ("IBPs") who essentially serve as distributors for the products sold by NuLife.  As is well known in this industry, a growing network of distributors is essential to the survival of a network marketing company.
>
> 4. During the 12 months from September 2019 through August 2020, NuLife averaged nearly 230 IBP enrollments per month. Following AVACEN's Zoom presentation on September 23, 2020, NuLife's IBP enrollments came to a near standstill.  In fact, for the month of October 2020, IBP enrollments were down nearly 85%.

5. As referenced in my original Declaration, attached as Exhibit 9 to NuLife's Motion for Preliminary Injunction is a screenshot of AVACEN Medical's consultant lookup page. As of late October 2020, approximately 70% of the AVACEN consultants identifiable through that lookup process, at least 175 consultants, are NuLife IBP's.

6. Based on information and belief, the NuLife IBPs recruited to participate in AVACEN's competing network marketing venture have ceased selling products through the NuLife network. In other words, it appears that AVACEN has successfully recruited away at least 175 NuLife IBPs in just over one month of doing business. This represents a significant percentage of NuLife's sales force. Based on information and belief, AVACEN's recruitment of NuLife IBPs is ongoing and continuing.

(Suppl. Decl. of Sherri Adams ¶¶ 3–6, ECF No. 15.)

On December 2, 2020, the Court held a hearing on the motion for preliminary injunction. NuLife stated on the record that the scope of the injunction that it is seeking is limited to enjoining AVACEN from recruiting NuLife's IBPs. The parties stipulated that an appeal of the Tennessee state trial court's judgment denying NuLife's motion for preliminary injunction was ongoing at the time of the hearing.

## II.    EFFECT OF PRIOR PROCEEDINGS IN TENNESSEE

NuLife brings the present motion for preliminary injunction after being denied relief by a trial court in Tennessee. "[A]llowing an unsuccessful party to a state court proceeding to raise similar arguments that involve re-litigation of issues unfavorably decided in a subsequent action brought in federal court may facilitate forum shopping." *See Hawaii Stevedores, Inc. v. HT&T Co., No. 04-00572 ACK-LEK*, 2005 WL 936451, at *7 (D. Haw. Feb. 24, 2005)). Therefore, the Court must first examine whether NuLife's renewed attempt to enjoin AVACEN is an improper attempt to relitigate its claims. For the following reasons, the Court finds that it is not.

The Full Faith and Credit Act requires a federal court to give a state-court judgment the same effect that it would have in the courts of the State in which it was rendered. 28

U.S.C. § 1738. "Federal courts may not 'employ their own rules . . . in determining the effect of state judgments,' but must 'accept the rules chosen by the State from which the judgment is taken.'" *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 373 (1996) (citing *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 481–82 (1982)). If state law would ban litigating a particular claim or issue because of a state-court judgment, then the federal court is also barred from litigating the claim or issue unless an exception to the Full Faith and Credit Act applies. *Id.* at 375.

The Court considers two doctrines of preclusion under Tennessee law: res judicata and collateral estoppel.[2] First, "[t]he doctrine of res judicata or claim preclusion bars a second suit between the same parties or their privies on the same claim with respect to all issues which were, or could have been, litigated in the former suit." *Jackson v. Smith*, 387 S.W.3d 486, 491 (Tenn. 2012) (citations omitted). The doctrine applies where: (1) "the underlying judgment was rendered by a court of competent jurisdiction"; (2) "the same parties or their privies were involved in both suits"; (3) "the same claim or cause of action was asserted in both suits"; and (4) "the underlying judgment was final and on the merits." *Long v. Bd. of Prof'l Resp. of Sup. Ct.*, 435 S.W.3d 174, 183 (Tenn. 2014).

Tennessee courts apply the "transactional" approach to determining whether two causes of action raised in different lawsuits are the same. *Creech v. Addington*, 281 S.W.3d 363, 379 (Tenn. 2009) (citing Restatement (Second) of Judgments § 24(1) (Am. L. Inst. 1982)). Under that approach, the two causes of action are considered identical if they "include all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." *Id.* The test, in essence, is whether the claims arose out of the same transaction or occurrence. *Id.* Under the transactional approach, "[t]he doctrine of res judicata 'extends only to the facts in issue as they existed at the time the judgment was rendered, and does

---

[2] Although no party has raised the issue of preclusion, the Court may reach the issue *sua sponte*. *See Johnson v. Gen. Motors Corp.*, 574 S.W.3d 347, 355 (Tenn. Ct. App. 2018), *appeal denied* (Feb. 20, 2019); *Headwaters Inc. v. U.S. Forest Serv.*, 399 F.3d 1047, 1054 (9th Cir. 2005).

1    not prevent a re-examination of the same question between the same parties where in the

2    interval the facts have changed or new facts have occurred which may alter the legal rights

3    or relations of the litigants.'"  *Id.* at 381 (citing *Banks v. Banks*, 18 Tenn. App. 347, 77

4    S.W.2d 74, 76 (1934)).

5         Here, the facts have changed after the trial court in Tennessee entered the final order

6    denying injunctive relief.  AVACEN had represented to that court that it did not intend to

7    start a competing MLM business.  (Def.s' Resp. in Opp. to Pl.'s TRO at 7, ECF No. 22-1.)

8    It was only after the state court entered the final order that AVACEN hosted the Zoom

9    meetings to announce its new business that would sell the Medical Devices through a

10   network of sales agents.  NuLife alleges that the Zoom meetings constitute evidence that

11   AVACEN has in fact launched a competing MLM business.  The Court finds that the new

12   factual development, which took place after the state court entered the final judgment, can

13   alter NuLife's rights against Defendants.  Therefore, "the same cause of action" element

14   of res judicata is not satisfied, and the doctrine of res judicata does not bar NuLife's claims

15   in this action.

16        Issue preclusion, or collateral estoppel, fails on similar grounds.  "Collateral estoppel

17   operates to bar a second suit between the same parties and their privies on a different cause

18   of action only as to issues which were actually litigated and determined in the former suit."

19   *Massengill v. Scott*, 738 S.W.2d 629, 631 (Tenn. 1987).  The elements of collateral estoppel

20   are: (1) "the issue to be precluded is identical to an issue decided in an earlier proceeding";

21   (2) "the issue to be precluded was actually raised, litigated, and decided on the merits in

22   the earlier proceeding"; (3) "the judgment in the earlier proceeding has become final";

23   (4) "the party against whom collateral estoppel is asserted was a party or is in privity with

24   a party to the earlier proceeding"; and (5) "the party against whom collateral estoppel is

25   asserted had a full and fair opportunity in the earlier proceeding to contest the issue now

26   sought to be precluded."  *Mullins v. State*, 294 S.W.3d 529, 535 (Tenn. 2009).

27        Here, the Tennessee court did not have access to the evidence of AVACEN's Zoom

28   meetings that is available now, and the court likely relied on AVACEN's representation

1    that it would not launch a competing MLM.  Under these circumstances, it would be unfair

2    for this Court to find that NuLife had a full and fair opportunity in the Tennessee

3    proceeding to litigate its claims.  *See  Detroit Police Officers Ass'n v. Young*, 824 F.2d 512,

4    515 (6th Cir. 1987) ("[C]ollateral estoppel may not be invoked where controlling facts . . .

5    have changed significantly.").

6         The Court adds that the pending appeal in Tennessee does not bar this Court from

7    ruling on NuLife's motion.  In general, "the pendency of an action in the state court is no

8    bar to proceedings concerning the same matter in the Federal court having jurisdiction."

9    *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)

10   (citing *McClellan v. Carland*, 217 U.S. 268, 282 (1910)).  This action does not present

11   circumstances that would make this case an exception.  In addition, a doctrine under

12   Tennessee law that requires dismissal of a lawsuit where the prior lawsuit is pending,

13   involving the same parties and the same subject matter, does not apply here.  *Southland*

14   *Mall, Inc. v. Garner*, 293 F. Supp. 1370, 1372 (W.D. Tenn. 1968) ("[T]he doctrine of prior

15   suit pending does not apply where the earlier suit is in state court and the later one is in

16   federal court.")

17        Therefore, the Court finds that the state court proceedings in Tennessee does not

18   prevent the Court from ruling on the present motion.

19

20   **III.    AVACEN'S OBJECTION TO SUPPLEMENTAL DECLARATION**

21        Before reaching the merits of NuLife's motion for preliminary injunction, the Court

22   first considers AVACEN's objection to NuLife's supplemental declaration of Sherri

23   Adams, which NuLife filed on November 6, 2020, two weeks after it filed the motion for

24   preliminary injunction and twenty-six days before the noticed hearing took place.  ("Adams

25   Decl. [2]," ECF No. 15.)   AVACEN raises three arguments against admitting the

26   supplemental declaration: (1) NuLife did not seek the Court's leave to file the supplemental

27   evidence under Fed. R. Civ. Proc. 15(a); (2) NuLife violated this district's Civil Local

28   Rules, which requires a minimum filing date of twenty-eight days prior to the date for

- 14 -

1   which the matter is noticed; and (3) NuLife did not show good cause for its untimely

2   submission, which prejudiced AVACEN.  (Def.'s Objection, ECF No. 17.)

3         "[A] preliminary injunction is customarily granted on the basis of procedures that

4   are less formal and evidence that is less complete than in a trial on the merits." *Univ. of*

5   *Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  This flexibility exists because "[t]he

6   urgency of obtaining a preliminary injunction necessitates a prompt determination."  *Flynt*

7   *Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984).  A district court therefore

8   "may give even inadmissible evidence some weight, when to do so serves the purpose of

9   preventing irreparable harm."  *Id.*  District courts have exercised this discretion to consider

10  a variety of evidence at the preliminary injunction stage that may otherwise be

11  inadmissible. *See, e.g.*, *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009) (holding

12  that the district court did not abuse its discretion by considering "unverified client

13  complaints" and counsel's declaration); *Flynt Distrib. Co.*, 734 F.2d at 1394 (holding that

14  it was within the district court's discretion to rely on hearsay statements); *Moose Creek,*

15  *Inc. v. Abercrombie & Fitch Co.*, 331 F. Supp. 2d 1214, 1225 n.4 (C.D. Cal. 2004)

16  (considering internet materials that were not individually authenticated).

17        The preference for flexibility weighs in favor of considering NuLife's supplemental

18  declaration.  AVACEN had six days to consider the supplemental declaration, before its

19  deadline to file a responsive brief expired.  If six days were not enough, AVACEN could

20  have requested an extension, which would have cured the problem.  Thus, prejudice to

21  AVACEN is not so great as to outweigh the preference for flexibility.

22        NuLife offers good cause for the delay—that is, the data covering the month of

23  October, which underlies the supplemental declaration, was not available at the time it filed

24  the motion for preliminary injunction in October.  *Cf. Newmark Realty Capital, Inc. v. BGC*

25  *Partners, Inc.*, No. 16-CV-01702-BLF, 2018 WL 2573183, at *4 (N.D. Cal. Mar. 30, 2018)

26  (finding that supplemental evidence was not untimely when that evidence was not available

27  at the time the initial document was filed).

28

1  Therefore, the Court overrules AVACEN's objection against the admission of
2  NuLife's supplemental declaration.

3

4  **IV.    PRELIMINARY INJUNCTION ANALYSIS**

5  The purpose of preliminary relief "is to preserve the status quo between the parties
6  pending a resolution of a case on the merits." *McCormack v. Hiedeman*, 694 F.3d 1004,
7  1019 (9th Cir. 2012) (citing *U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094
8  (9th Cir. 2010)).  To obtain a preliminary injunction, NuLife must satisfy a four-factor test,
9  establishing that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable
10  harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and
11  (4) an injunction is in the public interest.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555
12  U.S. 7, 20 (2008); *see also DISH Network Corp. v. F.C.C.*, 653 F.3d 771, 776 (9th Cir.
13  2011) (holding that a plaintiff seeking preliminary injunction "must demonstrate that it
14  meets all four of the elements of the preliminary injunction test").

15  In appraising NuLife's claims for the purposes of granting or denying preliminary
16  injunction, "[the court's] function is not to make an original judgment or to make a final
17  decision on the merits." *Sierra Club v. Hickel,* 433 F.2d 24, 33–34 (9th Cir. 1970), *aff'd*,
18  *Sierra Club v. Morton*, 405 U.S. 727 (1972).  "[P]laintiffs seeking a preliminary injunction
19  face a difficult task in proving that they are entitled to this 'extraordinary remedy.'" *Earth
20  Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010) (quoting *Winter*, 555 U.S. at 22).

21  For the following reasons, the Court denies preliminary relief.

22  **A.    Irreparable Harm in the Absence of Preliminary Relief**

23  NuLife has shown that it will suffer irreparable harm in the absence of preliminary
24  injunction.  For purposes of establishing the need for preliminary relief, "[i]rreparable harm
25  is traditionally defined as harm for which there is no adequate legal remedy, such as an
26  award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014)
27  (citing *Rent–A–Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603
28  (9th Cir. 1991)).  Moreover, "[a] preliminary injunction may only be granted when the

- 16 -

moving party has demonstrated a significant threat of irreparable injury, irrespective of the magnitude of the injury." *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 725 (9th Cir. 1999). The court must analyze whether irreparable harm is "likely" as opposed to "merely possible"—a "showing of mere possibility of irreparable harm is not sufficient under Winter." *See Earth Island Inst.*, 626 F.3d at 474; *see also Winter*, 555 U.S. at 22. The plaintiff must also show a "sufficient causal connection" between the alleged injury and the conduct the plaintiff seeks to enjoin such that the injunction would effectively minimize the risk of injury. *See Perfect 10, Inc. v. Google, Inc.*, 653 F3d 976, 982 (9th Cir. 2011); *see also Garcia*, 786 F3d at 745 (reasoning there is a "mismatch" between the plaintiff's substantive claim "and the dangers she hopes to remedy through an injunction").

NuLife argues that damage is "being inflicted upon its very business *structure*" by AVACEN's recruitment of NuLife's IBPs. (Pl.'s Reply at 4, ECF No. 19.) NuLife further argues that its supplemental declaration offers "not just conclusory statements but specific evidence regarding the number of IBPs who have departed for AVACEN." (*Id.*) Courts have held that loss of goodwill in business may support a finding of irreparable injury because it is not easily measurable in monetary terms. *See, e.g.*, *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm."); 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948.1 (3d ed.) (collecting cases). The consideration of loss of goodwill is particularly pronounced in cases in which employers seek to enforce restrictive covenants, known as non-competition agreements, against their former employees to prevent them from contacting their customers. *See* 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948.1 (3d ed.) (collecting cases); *See also Bad Ass Coffee Co. of Hawaii v. JH Nterprises*, L.L.C., 636 F. Supp. 2d 1237, 1246 (D. Utah 2009) ("[N]on-competes in general protect goodwill.").

In the MLM context, another district court in this circuit has found that a former sales distributor's violation of the non-competition agreements supported the finding of

- 17 -

irreparable harm to the plaintiff MLM company. *See Organo Gold Int'l, Inc. v. Ventura*, No. C16-487RAJ, 2016 WL 1756636 (W.D. Wash. May 3, 2016). In *Organo*, an MLM company sued its former distributor for violating the non-compete clauses in the restrictive covenants. *See Organo*, 2016 WL 1756636, at *2–3. The court found that the plaintiff company "[had] presented substantial evidence that its very business model relies upon forming robust sales networks of distributors" and that irreparable harm is a likely consequence of permitting an MLM company's former distributors to compete with the MLM company in violation of the restrictive covenants. *Id.* at *10.

Here, NuLife has offered evidence that AVACEN held online meetings to promote the launch of its competing MLM business that sells Medical Devices. (Doran Decl. ¶¶ 2–9; Adams Decl. [1] ¶¶ 7, 9.) Its evidence suggests that AVACEN advertised its business model as one that would cut out "the middleman," which implies NuLife. (Doran Decl. ¶ 5; Adams Decl. [1] ¶ 9; Ex. 6 to Pl.'s Mot. for Prelim. Inj., ECF No. 6-6.) The evidence shows that AVACEN offered incentives to applicants with prior experience selling AVACEN medical devices, and the qualifying applicants would necessarily have been NuLife IBPs. (Doran Decl. ¶ 7.)

NuLife posits that its business model is dependent on "the enrollment of [IBPs] who essentially serve as distributors for the products sold by NuLife." (Adams Decl. [2] ¶ 3.) NuLife provides evidence that the IBP enrollments saw a steep decline after AVACEN began promoting employment opportunities at its newly launched MLM business:

> During the 12 months from September 2019 through August 2020, NuLife averaged nearly 230 IBP enrollments per month. Following AVACEN's Zoom presentation on September 23, 2020, NuLife's IBP enrollments came to a near standstill. In fact, for the month of October 2020, IBP enrollments were down nearly 85%.

(*Id.* ¶ 4.) The declaration also states that 70% of AVACEN's distributors are NuLife IBPs, who have ceased selling products through the NuLife network. (*Id.* ¶¶ 5–6.) NuLife states that AVACEN's recruitment of NuLife IBPs is ongoing. (*Id.* ¶ 6.) Accordingly, the harm alleged by NuLife is irreparable for the purposes of the preliminary injunction analysis.

However, that does not end the inquiry.  "The Supreme Court has emphasized that preliminary injunctions are 'an extraordinary remedy never awarded as of right.'"  *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc) (McKeown, J.) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)).  "In exercising their sound discretion, courts of equity should [also] pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Winter*, 555 U.S. at 24.  That is especially true, in this case, where the restrictive covenant at issue protects NuLife's goodwill in its business on the one hand, but also invokes public policy considerations on free competition and workforce mobility on the other.  Therefore, the Court further analyzes the rest of the preliminary injunction factors.

### B.    Likelihood of Success on the Merits

To satisfy the likelihood of success factor,  NuLife must establish that it will prevail on the merits at a final hearing with a "reasonable certainty."  *Sierra Club,* 433 F.2d at 33; *Williams*, 340 F. Supp. at 450.[3]  "While Petitioners carry the burden of demonstrating likelihood of success, they are not required to prove their case in full at this stage but only such portions that enable them to obtain the injunctive relief they seek."  *Doe v. McAleenan*, 415 F. Supp. 3d 971, 977 (S.D. Cal. 2019), *modified*, No. 19CV2119 DMS AGS, 2019 WL 6605882 (S.D. Cal. Dec. 3, 2019).  Because NuLife has clarified on the record that it is only seeking to enjoin AVACEN from recruiting its IBPs, the Court only addresses the claims that may form the basis of that relief.

### 1.    Breach of Contract

NuLife argues that it is likely to succeed on its claims that Defendants breached the IBP Agreement and NuLife Policies and Procedures.  Under California law, a plaintiff bringing a breach of contract claim must prove four elements: "(1) the existence of a

---

[3] Because the balancing of hardship to the parties is at best neutral, *see infra* Part IV.C., the Court does not apply the "sliding scale" approach, which lessens the movant's burden of proof to a fair chance of success on the merits in cases in which the harm that may occur to plaintiff is sufficiently serious.  *See William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.*, 526 F.2d 86 (9th Cir. 1975) (sliding scale approach).

contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis West Realty, LLC v. Goldman*, 51 Cal.4th 811, 821 (2011). NuLife grounds its breach of contract claims on three categories of contract clauses: prohibition of competitive behavior by IBPs; prohibition of misuse of confidential information; and rules on maintaining websites.

### i.   Non-Compete Clauses

As an initial matter, AVACEN argues that the non-compete clauses at issue—section 8 of the IBP Agreement and section 3.13 of the Policies and Procedures—are unenforceable in California as anticompetitive covenants that impose unreasonable restraints on trade. In California, "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Cal. Bus. & Prof. Code § 16600. The statute embodies the settled public policy in California that favors open competition. *Kelton v. Stravinski*, 138 Cal. App. 4th 941, 946 (2006).

Traditionally, courts have upheld a strict application of section 16600 to employment contracts that prohibited former employees from working for a competitor or soliciting the employer's clients for a set period of time following the termination of employment. *See Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 946 (2008) (holding that a strict application of section 16600 to employment contracts ensures "that every citizen shall retain the right to pursue any lawful employment and enterprise of their choice"). Recently, upon certification by the Ninth Circuit, the California Supreme Court clarified that "section 16600 applies to business contracts," and is not limited to employment contracts. *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1149–50 (2020).

Under section 16600, "covenants not to compete are generally unenforceable," save for the exceptions listed in sections 16601 through 16603. *Fillpoint, LLC v. Maas*, 208 Cal. App. 4th 1170, 1177 (2012). Those exceptions apply to contracts governing (1) sales of goodwill of a business or disposition of ownership interest in the business entity; (2) dissolution of the partnership or dissociation of the partnership or dissociation of a

partner from the partnership; and (3) dissolution or sale of a limited liability company.  *See* Cal. Bus. & Prof. Code §§ 16601–03.  None applies here.

Where, as here, no exceptions to section 16600 apply, the court must apply the reasonableness standard and examine whether the contractual restraint unreasonably deters competition given the purpose and effect of each contract.  *See Ixchel Pharma, LLC*, 9 Cal. 5th at 1150.  "Contracts with the purpose and effect of promoting trade and competition are valid even if their terms incidentally restrain commercial freedom in some way." *Id.* at 1155–56.  For example, an appellate court in California held that a noncompetition provision may be reasonable and valid if it does not "negatively affect the public interests, is designed to protect the parties in their dealings, and does not attempt to establish a monopoly." *Quidel Corp. v. Superior Court of San Diego Cty.*, No. D075217, 2020 WL 6534466, at *7 (Cal. Ct. App. Nov. 6, 2020).

The non-compete clauses at issue here do not have the purpose and effect of promoting competition.  To the contrary, similar policy considerations behind prohibiting anticompetitive employment contracts under section 16600—that gives preferential consideration to "the important legal right of persons to engage in businesses and occupations of their choosing," *see Edwards,* 44 Cal. 4th at 946—apply here.   Much like employment non-compete clauses, the contract at issue here prohibits former NuLife IBPs from soliciting business from NuLife's customers or IBPs.  (IBP Agreement, § 8; NuLife Ventures Policies and Procedures § 3.13.)  Those non-compete clauses restrict the IBP's ability to practice their sales profession in the MLM industry, which rely on a sales agent's recruitment of new sales agents.  The only difference here is that the IBPs are independent contractors, which is not enough to bring the contract outside the purview of section 16600. *See Guardian Life Ins. Co. of Am., Inc. v. Andraos*, No. CV0705732SJOFMOX, 2009 WL 10675264, at *3 (C.D. Cal. Mar. 26, 2009) ("The Court sees no reason why the California Supreme Court's interpretation of [section 16600] would apply differently to employees versus independent contractors."); *Leads Club, Inc. v. Peterson*, No. 05CV1717 J (JMA), 2005 WL 8173326, at *11 (S.D. Cal. Dec. 1, 2005) (holding the same in the MLM context,

- 21 -

where the plaintiff MLM company brought a claim of illicit competition against its former sales agents, who had been hired by the plaintiff as independent contractors).

The Court finds that NuLife has not demonstrated a probability of prevailing on the merits of its breach of contract claims grounded on the non-compete clauses.

### ii.    Confidentiality Clause

NuLife argues that AVACEN has used the contact information of NuLife IBPs and customers in violation of section 8.2 of its Policies and Procedures.  AVACEN argues that the IBP Agreement lost effect when NuLife materially breached the Agreement by suspending AVACEN's access to the Back-Office and terminated AVACEN's right to receive commissions as an IBP.  AVACEN also argues that NuLife has not offered any evidence to show that AVACEN breached the confidentiality clauses.

The Court agrees with AVACEN.  "When a party's failure to perform a contractual obligation constitutes a material breach of the contract, the other party may be discharged from its duty to perform under the contract." *Brown v. Grimes*, 192 Cal. App. 4th 265, 277 (2011).  The record before the Court suggests that NuLife unilaterally terminated AVACEN's privileges as an IBP after being notified that NuLife has breached the Reseller Agreement.  NuLife has not offered any explanation on why it terminated AVACEN's privileges or why its conduct should not be considered as a material breach that excuses further performance by AVACEN.  Given the lack of explanation from NuLife, the Court finds that NuLife has not demonstrated that it could overcome AVACEN's defense with a reasonable probability.

In addition, other than the vague allegation that "AVACEN has used NuLife's customer/IBP names and/or contact information for the benefit of its own new network marketing company," NuLife's filings lack particular allegations on how exactly AVACEN breached the confidentiality clause.  On the record before the Court, it is unlikely that NuLife could show that AVACEN breached the confidentiality clause of its Policies and Procedures, even if the court were to find that the IBP Agreement is enforceable against AVACEN.

Therefore, the Court finds that NuLife is not likely to succeed on the merits of its breach of contract claims that are relevant to its request to enjoin AVACEN from recruiting its IBPs.

### 2.    Tortious Interference with Contract

NuLife argues that AVACEN induced NuLife's IBPs to breach the IBP Agreement and its policy, thereby interfering with its contractual relations. Although NuLife raises the inducement of the breach of contract and interference with contract as separate claims, the analyses for the two claims merge. *See* Stanton T. Mathews, et al., *California Causes of Action* §8:10 (2018). Because it is likely that the non-compete clauses are void under California law, those clauses cannot form the basis of NuLife's claim for tortious interference with contract. *See supra* Part IV.B.1.i. Thus, the Court only considers whether NuLife has shown that it is likely to succeed on its claim that AVACEN induced NuLife's IBPs to breach the confidentiality clause.

To succeed on a claim for tortious interference with contract, the plaintiff must show the existence of (1) a valid contract between the plaintiff and a third party, (2) the defendant's knowledge of this contract, (3) the defendant's intentional acts designed to breach or disrupt the contractual relationship, (4) an actual breach or disruption, and (5) resulting damage. *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1126 (1990).

A sixth element—independent wrongful act—is required for a claim of interference of an at-will contract. This additional element applies to at-will contracts because the economic relationship between parties to contracts that are terminable at will "do[es] not involve the same 'cemented economic relationship[s]' as contracts of a definite term." *Ixchel Pharma, LLC*, 9 Cal. 5th at 1145. Given that an employee or a contractor can always break the contract and leave, the at-will contracts call for a different "balance between providing a remedy for predatory economic behavior and keeping legitimate business competition outside litigative bounds." *Ixchel Pharma, LLC*, 9 Cal. 5th at 1145–46 (citing *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 378 (1995)). Under

- 23 -

California law, that balance is struck by requiring the plaintiff bringing a claim for interference with an at-will contract to show that the defendant engaged in an independent wrongful act.

NuLife has not shown a reasonable probability that it can demonstrate AVACEN's independent wrongful conduct. "[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Ixchel Pharma, LLC*, 9 Cal. 5th at 1142 (citing *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1159 (2003)). Here, the alleged conduct by AVACEN was advising its prospective hires that they may be able to prove their prior sales experience by contacting NuLife's customers to retrieve the serial numbers. To the extent that NuLife argues that AVACEN committed misappropriation of trade secret, NuLife does not provide the specifics of whether AVACEN in fact received or used any protected trade secrets. Therefore, it is not likely to satisfy the wrongful acquisition, disclosure, or use element of a claim for misappropriation of trade secrets. *See* Cal. Civ. Code § 3426.1; 18 U.S.C. §§ 1832, 1839. NuLife offers no other theory on which it can show that AVACEN committed an independent wrongful act.

The Court finds that NuLife is not likely to succeed on the merits of its tortious interference with contracts claim.

### 3.    Intentional Interference with Prospective Economic Relations

A claim of intentional interference with prospective economic relations similarly requires an independent wrongful act as an element. *Korea Supply Co.*, 29 Cal.4th at 1158. For the same reasons as explained above, *supra* Part IV.B.2, the Court does not find that NuLife can establish that AVACEN engaged in an independent wrongful act.

Based on the present record before the Court, NuLife has not demonstrated a reasonable probability of success on the merits of its claims that could provide the basis for its requested relief. This factor weighs against granting the preliminary injunction.

//

//

1

2

**C.    Balancing Equities and Public Interest**

The equities of this action are not typical given the facts from which it arises. According to AVACEN, it voluntarily transferred more than 200 of its own sales force to NuLife to facilitate the sales of its Medical Devices, but NuLife did not fulfill the promised purchase quota, thus losing the right to sell AVACEN Medical Devices under the Reseller Agreement.   NuLife has offered no evidence or explanation that refutes AVACEN's argument that its failure to meet the purchase quota took away its right to sell AVACEN Medical Devices in the first place.

It is thus unclear where the status quo that NuLife seeks to preserve lies. If under the status quo, NuLife had no legal right to sell AVACEN Medical Devices, granting NuLife the requested relief would not restore its loss of opportunity to sell those products through its IBPs.  To the extent that NuLife argues that the status quo is the preservation of its IBPs, the Court lacks evidence on whether the IBPs sold any products other than AVACEN Medical Devices, and if so, how significant the loss of the sales of the other products are in its overall revenue stream, for the Court to weigh the hardship to NuLife in the absence of injunctive relief.

Although NuLife argues that the narrow scope of the preliminary injunction minimizes hardship to AVACEN, AVACEN would nonetheless be burdened if it was not allowed to hire a certain pool of the workforce who has specialized knowledge of AVACEN Medical Devices and prior experience marketing those products in the market. Further, enjoining AVACEN would contradict the long-recognized policy in California that favors open competition, mobility of workforce, and freedom to pursue one's profession.  The California Supreme Court has recently underlined the importance of the right of market participants to "pursue opportunities for economic betterment" as well as "the right of employers to compete for talented workers," in the context of at-will commercial contracts.  *Ixchel Pharma, LLC*, 9 Cal. 5th at 1144–45.

Based on the above, the Court finds that balance of equities and public interest weigh in favor of denying preliminary injunction.

- 25 -

**V.     CONCLUSION**

The Court therefore **DENIES** the motion for preliminary injunction sought by NuLife.  (ECF No. 6.)


     **IT IS SO ORDERED.**


**DATED: December 11, 2020**

Hon. Cynthia Bashant
United States District Judge